**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00741 (DLF)** |
| **v.** | : | |
| | : | |
| **MATTHEW JAY WEBLER,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that the Court sentence Matthew Jay Webler to three months of incarceration and $500 restitution.

## I.      Introduction

The defendant, Matthew Jay Webler, a Georgia resident with 11 prior criminal convictions—including two 2001 convictions for aggravated assault—participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Webler pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained here, a sentence of three months of incarceration is appropriate in this case because: (1) Webler entered the Capitol through a broken window, traveling past unmistakable signs of violence including broken glass and damaged property; (2) he cheered and celebrated during the breach, singing "Happy birthday to me," while inside the Capitol, and shouted to the crowd, "Woo, 1776!" upon exiting; (3) his statements on

1

Facebook and to law enforcement after January 6 reveal a lack of remorse; and (4) his social media statements and substantial criminal history both suggest the possibility of future violence by this defendant.

The Court must also consider that Webler's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Webler's participation in a riot that succeeded in halting the Congressional certification combined with his lack of remorse, and the potential for future violence render a significant jail sentence both necessary and appropriate.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid repetition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Doc. 14 (Statement of Offense) at ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Webler's conduct and behavior on January 6.

### Matthew Webler's Role in the January 6, 2021 Attack on the Capitol

Webler drove for 12 hours from his home in Georgia to Washington, D.C. on January 5. On January 6, he attended the "Stop the Steal" rally and then walked to the Capitol.  Webler then made his way across the restricted grounds to the Capitol Building.

At approximately 2:13 p.m., the Senate Wing Door of the U.S. Capitol building was breached when rioters broke the glass windows on either side of the door, climbed inside the building, and then kicked the door open from the inside:



A video taken from the outside of the door captured a rioter kicking the Senate Wing Door from the outside with his foot and shows that the window glass of the Senate Wing Door was smashed during the breach. [1]

---

[1] *Available at* https://projects.propublica.org/parler-capitol-videos/?id=Z53KwQnRVQtM, timestamp 0:10, last visited March 16, 2022.



A stream of people proceeded to enter the building through the door and the broken windows:



Webler climbed through one of the broken windows at 2:22 p.m., wearing a bright yellow jacket and a QAnon flag on his back like a cape (Exhibit 2[2]):

---

[2] The exhibits referenced here were provided in connection with the Notice of Filing of Items Incompatible with CM/ECF Filing.  Doc. 19.







Webler took a video as he breached the building. (Exhibit 1). The video captured the sound of the sustained beep of an alarm as Webler entered the building. It also captured the smashed glass on the exterior door he walked past, the broken glass on the window ledge that Webler stepped over as he climbed through the window, and more glass and broken objects just inside the building. The following screenshots are from Exhibit 1:







About an hour later, Webler messaged a friend on Facebook describing his entry: "Dude, I know what the fuck happened.  One minute we're on the capitol steps the next thing you know there's 2 huge booms we suddenly surge forward as one huge mass."

Once inside the Capitol, Webler walked with a crowd of people into the Crypt.  The crowd chanted "Our house," and "Stop the steal." (Exhibit 3).  Webler gleefully sang, "Happy birthday to me, happy birthday to me." (*Id*.)  One man began to knock down metal poles connected a rope barrier.  Webler said to him, "There's no sense to destroying it, dude, it's our property.  We don't destroy our own property."  Webler then continued to walk throughout the building.

In one area, officers had attempted to lower two gates to limit the movement of the rioters, but rioters repeatedly prevented the gates from lowering:



Webler approached that area, and then walked in the other direction:



He exited the building through a different door 21 minutes after he entered, at 2:43 p.m. He again took a video of his path out of the building. Loud chants of "USA, USA" can be heard along with one person shouting, "We want Nancy." (Exhibit 5). Once outside, Webler shouted,

"Woo, 1776!" A person approached him and asked if he had gotten inside and where he had entered the building. Webler responded that he had gotten in around the other side of the building. (*Id*.)

At his plea hearing, Webler admitted that at the time he entered the Capitol Building, he knew that he did not have permission to enter, and he paraded, demonstrated, or picketed.

*Webler's Social Media Posts*

Before Webler arrived at the Capitol on January 6, he had been discussing the results of the presidential election on social media. After the November 3, 2020 election of Joe Biden, Webler made several Facebook posts expressing his intention to fight to ensure that Donald Trump became the next president. For instance, on November 22, 2020, he wrote, "[I]f things don't go the way that I believe their [sic] planned the only way Biden takes office on 1/20/2021 is if me and millions of other Americans like this guy are laying cold and dead on Capitol Hill. I will be there to instigators inaugurate President Trump or to fight to the death for MY COUNTRY."

On January 3, 2021, two days before heading to Washington, D.C., Webler posted a message on Facebook stating, "I'll be in DC with my gun because if I'm wrong that's the only option left." Webler had previously exchanged chats over social media discussing his ownership and purchase of firearms, including writing on December 3, 2020 that "I'm looking for a cheap gun," and that he did not need an "a r style" because "I've got plenty of long guns." Likewise, on December 16, 2020, Webler wrote on Facebook, "What gun laws? I only know of one. The right to bear arms shall NOT be infringed."

On January 6, before arriving at the Capitol, Webler posted that "if this goes to the twentieth war will happen," likely referring to January 20, 2021, the day of the presidential inauguration:

We're in the middle of the largest scale way [sic] ever fought on earth.

I do know we were promised three years ago there would be no civil war, that it would be swift and clear and that all America would be unified again.

I'm hoping with everything that is true but we're almost out of time. If this goes to the twentieth war will happen.

Webler continued to post messages while inside the Capitol. In one exchange, he wrote, "I'm in the capitol. We broke in." He further described surging forward with the crowd after hearing two huge booms:

**Author** Matthew Webler (Facebook: 1775140722)
**Sent** 2021-01-06 19:25:05 UTC
**Body** I'm in the capitol.

　　　We broke in.

**Author** ████████ (Facebook: 569920806)
**Sent** 2021-01-06 19:36:20 UTC
**Body** Sweet

**Author** ████████ (Facebook: 569920806)
**Sent** 2021-01-06 19:37:14 UTC
**Body** Be sure to wear your mask even my phone can't recognize me with my mask on.

**Author** Matthew Webler (Facebook: 1775140722)
**Sent** 2021-01-06 19:56:51 UTC
**Body** Dude. I know what the fuck happened. One minute we're on the capitol steps the next thing you know there's 2 huge booms we suddenly surge forward as one huge mass.

　　　I had no intentions of doing any more than screaming.

　　　I spent 20 minutes wandering around and booked it.

Webler recorded a video of himself on his way back to Georgia that he posted to social media. He seemed surprised and somewhat shaken by the events of the day, noting that "we went there planning to have a peaceful protest" and "this is not what was supposed to happen" (Exhibit 6). Nonetheless, after January 6, Webler downplayed the violence and damage caused that day.

He posted one of his videos to Facebook, writing, "TELL ME AGAIN WHERE DO YOU SEE THE TERROR":



He also continued to show his general contempt for the law, writing on August 9, 2021, "there's no such thing as an illegal weapon.  There are however many illegal laws."

*Webler's Arrest and Interview*

On December 3, 2021, Webler was arrested on a warrant charging him with misdemeanor offenses related to his conduct on January 6.  That day, agents conducted a search warrant of his home and found the accessories Webler had worn to the Capitol on January 6.  They also found a small amount of suspected methamphetamine, a homemade short-barrel rifle with a silencer attached to it, ammunition and two magazines, additional unregistered silencers and other firearm parts or tools.  Because Webler was convicted in 2000 of the felony of aggravated assault, he is prohibited from possessing firearms.  He is currently facing federal firearms charges in the Northern District of Georgia.  Webler has been detained on both sets of charges since his arrest on December 3.[3]

---

[3] By the time of his sentencing in this case, Webler will have been in pretrial custody for approximately five months.  The determination of a sentence of incarceration is nonetheless consequential for him because his time in pretrial custody that is not applied to this case may be

Webler voluntarily agreed to an interview with the FBI at the time of his arrest.[4]  He told the agents that on January 5, he drove for 12 hours from Georgia to Washington, D.C. with a caravan of other QAnon followers.  He said that the doors were open and he walked inside, though he later admitted to climbing through a window.  He said he did not see any signs that he was doing something wrong, and no officers told him to stop.  He told the agents that he saw someone who he believed to be with Antifa who was harassing an officer, and he told the man to stop. Webler did not express remorse for his participation in the Capitol siege; instead he told the agents that he "didn't do anything wrong."

*The Charges and Plea Agreement*

On November 24, 2021, Webler was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) & (G). On December 3, 2021, he was arrested at his home in Georgia as described above. On December 21, 2021, Webler was charged with the same four charges by Information.  (Doc. 6).  On February 1, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picking in the Capitol Building. By plea agreement, Webler agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Webler now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Webler faces up to six months of

---

applied to his ultimate sentence in his pending firearms case. *See* 18 U.S.C. § 3585(b)(2) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed[] *that has not been credited against another sentence*.") (emphasis added)
[4] Webler agreed to speak to the agents about his conduct on January 6, but exercised his right to remain silent as to the firearms found in his home.

imprisonment, up to five years of probation and a fine of up to $5,000. Webler must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the § 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive

14

fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Webler's individual conduct, this Court, in determining a fair and just sentence should look to a spectrum of aggravating and mitigating circumstances, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Webler personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts Webler's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants.

Here, while Webler claimed that he saw no indication that he was not allowed to enter the Capitol Building, both CCTV and his own video capture him climbing through a broken window and stepping over shattered glass to make entry, and his social media posts acknowledge that "[w]e broke in." After entering, Webler continued to travel deeper into the building despite the property damage visible on the inside. While Webler's suggestion that another rioter not damage property was a positive, his singing "Happy birthday to me" and cheering, "Woo, 1776!" inside the Capitol

were not.  Indeed, when he was approached by another rioter outside the building who asked how he got inside, he seemed to provide advice about how to do so.

It is equally troubling that months later, Webler continued to post messages to social media downplaying the Capitol siege.  In an April 28, 2021 post, he wrote, "Biden called Jan 6 the worst domestic terror attack in our history. . . . At no time did I feel us our [sic] any Capitol Police were in danger.  TELL ME AGAIN WHERE DO YOU SEE THE TERROR?"  And while Webler has made clear by entering a guilty plea and in his statements to the PSR writer that he accepts responsibility for his actions, that is different than an expression of remorse, something the government has yet to see.  *See* PSR ¶ 19 ("Regarding acceptance, Mr. Webler fully accepts responsibility for the offense to which he pled guilty.  He entered into an early plea with the government shortly after his initial appearance in the Northern District of Georgia, allowing for the efficient use of prosecutorial and judicial resources.").

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B.  Webler's History and Characteristics

As set forth in the PSR, Matthew Webler's criminal history is particularly concerning. Between 2000 and 2014, he had 11 different criminal convictions.  Most seriously, Webler was twice convicted of aggravated assault in 2000 and 2001 for which he was sentenced to 20 years to serve five, and 10 years to service one in prison, respectively.  PSR ¶¶ 27, 28.  According to the PSR, the indictment in one of those cases alleged that Webler obtained a motor vehicle in the presence of the victim by stabbing the victim numerous times and then driving off.  *Id*. ¶ 27.  The other indictment alleged that he rendered the victim's left eye of the victim useless by striking him on the face with a blunt object.  *Id*. ¶ 28.  Webler was also convicted on charges of burglary, second

degree burglary, battery, receiving stolen property, as well as having five convictions for driving under the influence. *Id*. ¶¶ 23-33.

On top of these serious offenses, Webler has had multiple probation violations with increasingly severe consequences. In 2005, he had a violation that resulted in a modification of the conditions of his release. PSR ¶¶ 27, 28. In 2010, he violated the terms of his probation and received 90 days in prison. *Id*. And in 2013, he violated again and was sentenced to two years in prison. PSR ¶ 27.

Currently, Webler is under indictment for three firearm offenses in the Northern District of Georgia based on firearms and related equipment that agents found in Webler's home when executed a search warrant in this case. Finally, according to the Probation Office in the Northern District of Georgia, Webler committed the offenses in this case while on probation for the second-degree burglary offense. Webler's history shows that his breach of the Capitol on January 6 was not an aberration from an otherwise law-abiding life. Although there is no guidelines range in this case to directly take into account Webler's criminal history, his sentence should reflect this past criminal conduct.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Webler has repeatedly shown his contempt for the law, both in word and action.  He has glorified violence and war on social media, describing his readiness to "fight to the death" to see President Trump declared president.  He has bragged that, "[p]ersonally I don't care WTF ATF thinks," and "there's no such thing as an illegal weapon.  There are however many illegal laws," and "What gun laws?  I only know of one.  The right to bear arms shall NOT be infringed."  And most concerning, he has consistently violated the law during his adult life, committing serious crimes both before and after January 6.  The specific deterrence that can be achieved by depriving a defendant of his freedom is warranted here.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[6] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[7] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic

---

[6] Attached to this supplemental sentencing memorandum is an appendix providing additional information about the sentences imposed on other Capitol breach defendants.  The appendix also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[7] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Webler has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating or picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, a defendant's history and characteristics, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514

F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

Taking into account the defendant's criminal history, the government's request avoids unwarranted sentencing disparities. While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the following case is extremely similar to this one. In *United States v. Dresch*, the defendant made Facebook posts during the lead-up to January 6 that were comparable to Webler's, indicating his readiness for violence to "TAKE BACK OUR COUNTRY." Dresch entered the Capitol through a door (not a window) and spent about 25 minutes inside, walking through the Crypt like Webler. He did not engage in acts of physical violence or destruction of property. Dresch later expressed satisfaction and enthusiasm regarding the events at the Capitol. Again like Webler, Dresch had a criminal history, albeit not as serious. He had a felony conviction for fleeing and eluding arrest and multiple misdemeanor convictions. Finally, like Webler, police found and seized firearms and ammunition from Dresch's

home even though he was a convicted felon.  The government requested the maximum term of imprisonment for Dresch, six months.  The Court sentenced him to six months, time served, based on a consideration of all of the 3553(a) factors.  *See United States v. Dresch*, Case No. 21-CR-71 (ABJ).

Two other defendants whose criminal histories served as a determining factor at sentencing are Robert Bauer and Edward Hemenway, who were charged as co-defendants in *United States v. Robert Bauer and Edward Hemenway*, 21-cr-49 (TSC).  Both Bauer and Hemenway entered guilty pleas to one count of 40 U.S.C. § 5104(e)(2)(G), like Webler.  The government requested 30 days of incarceration and $500 in restitution and Judge Tanya S. Chutkan sentenced both Bauer and Hemenway to 45 days of incarceration, 60 hours of community service, and $500 in restitution.

To support its request for the incarceration of Bauer, the government pointed to the following factors: (1) although Bauer admonished other rioters not to assault law enforcement officers, he treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised; (2) Bauer remained inside the Capitol for a brief period of time – approximately 17 minutes – yet made his way into the Crypt, where police officers were being attacked; (3) Bauer admitted to his actions only two days after the riot and accepted responsibility early through a plea agreement; (4) Bauer has not expressed true remorse for his actions, stating to the FBI, "I don't feel like I done nothing terribly wrong"; and (5) Bauer had a serious criminal history. The government relied on many of the same factors regarding Hemenway, with the differences being that Hemenway did not admonish other rioters to not assault law enforcement, admitted to his actions a few days after the riot, and expressed remorse for his actions. 21-cr-49, ECF No. 33 at 2.

The biggest difference between Webler on the one hand, and Bauer and Hemenway on the other, is that Webler has a longer and more serious criminal history than the others. Bauer's criminal history involved Operating a Motor Vehicle Alcohol-Drugs in 1999, when he was 21 years old; Possession of Anhydrous Ammonia and Vandalism in 2005; Possession of Methamphetamine, Manufacturing Methamphetamine and related charges in 2005; and Unlawful Possession of Meth Precursor in 2006. *Id.* at 11-12. Hemenway's criminal history involved a 2006 conviction for Sexual Battery and Criminal Confinement for which he received a three-year sentence of imprisonment of which one year was suspended, along with a probation revocation that resulted in an additional five years of imprisonment. 21-cr-49, ECF No. 32 at 11. By contrast, Webler's criminal history includes two serious aggravated assault convictions, convictions on charges of burglary, second degree burglary, battery, receiving stolen property, five convictions for driving under the influence, as well as multiple probation violations and pending federal firearm charges. To account for his more substantial criminal history, the government requests a longer sentence of incarceration for Webler.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Matthew Jay Webler to three months' incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:  */s/ Alison B. Prout*
ALISON B. PROUT
Assistant United States Attorney
Georgia Bar No. 141666
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
(404) 581-6000
alison.prout@usdoj.gov