UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(WASHINGTON, DC)

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| V. | ) | Criminal No. 1:21-CR-741-DLF |
| | ) | |
| MATTHEW WEBLER | ) | |

## SENTENTCING MEMORANDUM

NOW COMES MATTHEW WEBLER ("Mr. Webler"), by and through undersigned counsel, and files this memorandum in support of a reasonable sentence.

## I.  PRELIMINARY STATEMENT

On February 1, 2022, Mr. Webler pled guilty to one count of parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2), a Class B misdemeanor. The charge stems from his presence inside the U.S. Capitol on January 6, 2021. He did not engage in violence or damage property. He entered the building through a window, which had previously been broken, walked around for 20 minutes, took video of what was happening, and left. The same day, he drove back to Georgia. He had driven up the night before. Mr. Webler visited only the public, common areas of the building. He did not enter any private areas or offices.

Mr. Webler was initially charged and arrested in this case pursuant to a Criminal Complaint filed November 24, 2021. *U.S. v. Webler*, 1:21-CR-00741-DLF, (Doc. 1). On December 3, 2021, Mr. Webler was arrested at his home. Also, on December 3, 2021, Mr. Webler was charged by Criminal Complaint in the Northern District of Georgia with firearms violations based upon certain items located inside of his home at the time of his arrest. *U.S. v. Webler*, 1:21-CR-00504-TWT-LTW (N.D. Ga.), (Doc. 1).[1] On December 6, 2021, Mr. Webler made his initial appearance in Court in Atlanta. *Id*. at (Doc. 2). On December 13, 2021, Magistrate Judge Walker detained Mr. Webler in both cases. *See* 1:21-MJ-1141-LTW, (Doc. 10); 1:21-MJ-1144-LTW, (Doc. 9).

A look to the offense at issue shows that Mr. Webler was one of many who entered and exited the Capitol without violence. He himself did not present a danger. After his arrest, he waived his *Miranda* rights and admitted his crime. He even initialed photos showing him entering and inside of the Capitol. In this case, a sentence of *less than* 30 days confinement is sufficient. As of the date of sentencing, May 3, Mr. Webler will have been in custody for five months.

---

[1] Law enforcement obtained a warrant in the Northern District of Georgia to search Mr. Webler's home for firearms as a result of the information authorities obtained from Facebook in connection with the January 6 investigation. The warrant was executed on December 3, 2021, the day of his arrest in this case.

II.     **FACTS**

On the evening of January 5, 2021, Mr. Webler drove to Washington D.C. to participate in the rallies and listen to the speeches relating to the presidential election the next day. After attending the speeches and rallies near the Washington Monument, Mr. Webler walked with the crowds to the Capitol. Mr. Webler believed that former President Trump's instructions were to walk to the Capitol to show support. It was not Mr. Webler's intent to enter the building but when he saw others, he followed.

Mr. Webler walked up the steps at the West Entrance near the Senate Wing and entered through a broken window behind a line of others doing the same. The window was already missing. According to the government, the time was 2:22 p.m. (PSR at ¶ 14). A review of the video from Mr. Webler's cell phone, which the government filed, shows Mr. Webler waiting in a long line to climb through the window. (Gov. Ex. 1). Notably, as he gets closer to see what is happening, you can hear him exclaim, "Oh my God." (Gov. Ex. 1 at 00:08 – 00:10).

After entering, Mr. Webler walked through several common areas and shot video of what was happening. Mr. Webler never appears to be shouting at others or exhorting others on. After a time in relatively crowded common areas, having seen enough, Mr. Webler can be heard on his video politely asking Capitol Police how to get out. (Gov. Ex. 5 at 00:15 – 00:24). He eventually made his way out

through the Memorial Door on the other side of the building at 2:43 p.m., having spent 21 minutes inside. (PSR at ¶ 15). He did not engage in any violent behavior or property damage. In fact, Mr. Webler witnessed others kicking over stanchions. (Gov. Ex. 3 at 01:25 – 01:40). In response, he quickly exclaimed, "There's no sense in destroying it dude, it's our property. We don't destroy our own property." (Id.). Taking their cue from Mr. Webler, others can be heard chiming in and agreeing, condemning the behavior. (Id.).

Mr. Webler left Washington D.C. that same day and returned to Georgia. In his car, somewhere in South Carolina, Mr. Webler decided to document his experience, again turning to his cell phone. Mr. Webler had a Facebook account where frequently posted items. The video is insightful because it records his fresh impressions about what happened and his mindset and motivation. Undoubtedly, Mr. Webler had no idea or expectation that he would be charged with a crime later. He starts by stating that he is in South Carolina and fine but "other than that, I don't know what to say about what happened today." (Gov. Ex. 6 at 00:04-00:20). The look on his face is one of disbelief and shock about what he had just experienced.

In his self-shot video, Mr. Webler continues by explaining that he went there planning to participate in a peaceful protest. There was no fighting or counter-protests, and everything was calm. (Gov. Ex. 6 at 00:00 – 00:34). Mr. Webler states:

"The President told us we were going to walk down Pennsylvania Avenue and go to the Capitol. He was going to walk with us and we were going to provide a backbone to the weak Senators." (Id. at 00:35 – 00:46). Mr. Webler then explains:

> By the time we got to the Capitol, everything changed from nice, quiet, people that were just enjoying themselves, to absolute chaos at the Capitol. The people that were at the Capitol causing this, were not part of the group that was out on the Ellipse. They were not part of it. Everybody that was on the Ellipse and around the Washington Monument and all that, they weren't having none of that. They weren't part of that. But, uh, I guess mob mentality kind of kicked in as well. And, I don't know, it was nuts. It was really, really nuts. But, when we got to the Capitol lawn, the people that I was hanging out with noticed that everybody was up on the steps and up on the stage for the Inauguration. So, I was like, man I gotta go up there, and I gotta get a picture from up there. That's all I went up there to go do. Then, all of a sudden, here people were in and, go right through the doors into the Capitol.

(Gov. Ex. 6 at 00:46 – 01:58). Against his better judgment, Mr. Webler followed.

Next, in his video, Mr. Webler tries to explain what happened inside. Webler explains his interactions with Capitol Police, including commending them on the job they were doing in managing a difficult situation:

> I get in there and there was Capitol Police in there. And they were trying to escort people, "You all go over here. You all go over here." I walked up to one and tapped him on the shoulder and said, "Excuse me sir, can I get by," and he let me by. I even went up to them (and I have video of them standing there), and I went up to them and said, "Listen, you guys, I know you've got a really, really tough job, and I do not envy you whatsoever, I just want to let you know we appreciate you." Even though people were giving them hell, screaming and yelling at them, and these guys were – the Capitol Police were doing nothing wrong. They were literally just standing

there and watching us and. . . . I don't know. This is not what was
supposed to happen . . . .

(Gov. Ex. 6 at 02:04 – 02:40). Mr. Webler concluded by explaining that it did not

take long for him to decide to "get the heck out of there," having seen enough. (Id.

at 3:10 – 3:20). He concludes by noting that it was not violent when he was in the

building – at least, he saw no violence against the police. (Id. at 3:19 – 3:43). He

acknowledged that something must have changed, but he did not know what.

(Id.).

Mr. Webler was arrested 11 months later, on December 3, 2021. He will have

been in custody 5 months as of the day of sentencing. However, he is asking the

Court to impose a sentence of less than 30 days of incarceration, allowing for the

remainder of his time in custody to be allocated to any sentence he may receive on

the Georgia charges. Such a sentence would be reasonable under 18 U.S.C. § 3553.

### III.   ARGUMENT

Because this case was resolved appropriately with a Class B Misdemeanor,

there is no need for the traditional walk through the advisory U.S. Sentencing

Guidelines and all which that entails. Rather, the remaining statutory sentencing

factors of 18 U.S.C. § 3553(a) will govern.

### A.   The Nature and Circumstances of Mr. Webler's Offense Warrant a Sentence of less than 30 Days of Incarceration.

When weighing the nature and circumstances of the offense under § 3553(a)(1), the starting point has to be to correctly define the offense. This, in turn, should involve focusing on Mr. Webler's conduct, not the conduct of others. Of course, the context of his decision-making and actions matters, but it does not subsume what is most important - - what Mr. Webler did or did not do. But first, the charge.

The government properly chose to resolve this case with Mr. Webler's plea to a violation of 40 U.S.C. § 5104(e)(2)(G) which makes it a crime to "parade, demonstrate, or picket in any of the Capitol Buildings." This offense is a Class B Misdemeanor, which authorizes a sentence of incarceration of 0 – 6 months. *See* 40 U.S.C. § 5109(b) (penalty); 18 U.S.C. § 3559 (classifying offenses). The federal criminal code further classifies this type of misdemeanor as a "petty offense." 18 U.S.C. § 19. The Supreme Court has found that such offenses, by legislative definition, are not serious enough to trigger a Sixth Amendment right to a jury trial. *Blanton v. City of North Las Vegas, Nevada*, 489 U.S. 538, 543-45 (1989); *United States v. Barnes*, 2019 WL 1980991 (D.D.C., May 3, 2019) (unpublished) (explaining Class B misdemeanor is a petty offense without the right to a jury trial).

Notably, the statute containing Mr. Webler's offense contains a number of subsections which address other activities that are not permitted on Capitol grounds. These other prohibited activities, although carrying the same range of punishment, include the unlawful entry into the more sensitive areas of the Houses of Congress (e.g., floors, cloakrooms, or lobbies); the entry into designated Congressional rooms with the intent to disrupt business; engaging in disorderly or disruptive conduct on Capitol Grounds or in any Capitol Building; or obstructing passage or engaging in physical violence through or within such grounds or buildings. 40 U.S.C. § 5104(e)(2)(A) – (F). Finally, section 5104(e)(2)(G) prohibits the act of parading or demonstrating, which is what Mr. Webler did.

Thus, section 5104(e)(2) itself distinguishes among different types of behaviors. And, although each of subsections (A) through (G) carries the same range of punishment, the nature of each offense may vary in severity. Certainly, committing an act of violence or knowingly and willfully obstructing passage through the Capitol Buildings is more aggravated than an unsanctioned parade or walk though. Indeed, a non-obstructive, non-violent entry, walk through, and exit under § 5104(e)(2)(G) would fall on the less aggravated end of the scale within this statute. The context of what *others* were doing does not change this.

Again, the facts of Mr. Webler's offense show that he drove to Washington D.C. on January 5, 2021 to attend the rallies and speeches in support of former

President Trump. Notwithstanding one pre-travel, chest-thumping missive about having to "bring his gun," (PSR at ¶ 13) there is no evidence or suggestions that this was anything other than bluster.[2] He had no weapon. Nor does his behavior, as recorded on his cell phone (and closed circuit television), suggest *any* level of agitation or violence on his part. To the contrary, he seemed shocked and genuinely overwhelmed. Caught up in the moment, he yells "1776" but only after he left the building. (PSR at ¶ 15). To be sure, he did get caught up in the fervor of it all and entered. And, while inside, yelled, "Happy Birthday to me," (PSR at ¶ 14) as ironically, January 6, is Mr. Webler's birthday. (PSR, page 2). None of that aggravates his parading charge and certainly not when viewed in the context of how he otherwise behaved.

While inside, he walked around calmly, showed respect to the Capitol Police, and asked for directions out when he had seen enough. Moreover, as he was leaving, he scolded a person for an attempt to vandalize Capitol property. As the government highlighted in its initial Criminal Complaint, two days later, on January 8, 2021, Mr. Webler posted the following to social media:

> Also proud of myself for not getting caught up to [sic] much and having the sense to stand up to someone trying to vandalize the place. Missed the guy taking "souvenirs" [sic] though . . .

---

[2] The pending charges in Georgia, in essence, allege that Mr. Webler constructed a gun by obtaining parts through the mail, beginning September 26, 2001, after January 6, 2021. No other gun was located at the home.

*U.S. v. Webler,* 1:21-MJ-00667-GMH, Doc. 1-1 at 11. Counsel is not aware of any posts following the event which would demonstrate callousness or a lack of appreciation for what happened.

Ultimately, after Mr. Webler was arrested on December 3, 2021, he fully accepted responsibility for his behavior at the Capitol. Mr. Webler waived his *Miranda* rights and admitted to entering the Capitol. In addition, he initialed photos depicting him entering and walking around the public areas of the Capitol building. After his initial appearance, Mr. Webler quickly expressed his desire to plead guilty. And, less than two months after his arrest, on February 1, 2022, he entered his guilty plea.

The nature and circumstances of Mr. Webler's offense and his reaction to it weigh in favor of a sentence which minimizes incarceration. A sentence of less than 30 days incarceration would serve all of the statutory sentencing goals of § 3553(a).

> **B.     Mr. Webler's History and Characteristics Support a Custodial Sentence of Less than 30 days of Incarceration.**

Mr. Webler is 43 years old. He has been married for five years to Kirsten Webler. They have known each other for over ten years, since 2011. During their five years of marriage, Matthew and Kirsten have lived in Decatur, Georgia. Kirsten has a 13-year old daughter, Jaidyn Nix, from a prior relationship, who lives

with her ex-husband in Clarksville, Georgia. She has joint custody, and Jaidyn stayed with her and Matthew, at a minimum, every other weekend. In reality, it was much more. Matthew and Kirsten also were in the process of adopting a baby boy when he was arrested. The adoption process was halted as a result of this case and its collateral consequences. Matthew was the sole financial support for Kirsten.

For almost a decade, Matthew's focus had been work and family. These were productive and stabilizing forces in his life. From an early age, however, Matthew struggled with alcohol and substance abuse, as can be seen from his several DUI convictions. (PSR at ¶¶ 23-33). As is usually the case, these struggles led to poor choices and consequently criminal convictions. (Id.). These convictions ended after he met his wife in 2011.[3] Nevertheless, more recently, Matthew has secured and maintained well-paying work for years. Mr. Webler has become a dedicated, dependable, and skilled worker and family provider.

Mr. Webler is naturally mechanical and an analytical problem solver. These skills and talents led him into construction. In 2014, he secured a job with Upper

---

[3] Although the PSR references a burglary conviction from 2015 (PSR at ¶ 33), the conduct that this pertains to occurred on October 22, 2011, actually predating the conviction in paragraph 32. (*See PSR at* ¶¶ 32, 33). Please note that the conviction in paragraph 32 occurred on 2/1/12, not 06/13/11 as the PSR states (indeed, the arrest is 10/25/11). For whatever reason, Gwinnett County waited over three years to charge him for an *earlier* offense. (*See* PSR at ¶ 33). Mr. Webler had not been arrested for new criminal conduct since 2011.

Level Construction as a carpenter foreman. During this time, for about eight months, he lived in Georgia, but travelled to Lancing and Detroit, Michigan to build student housing for Michigan State University and build a retirement home. While working there, he cut his thumb off. It could not be saved. This set back did not stop him.

After only six weeks of convalescence, and missing his thumb, Matthew began working at Jamont Homes, also as a carpenter foreman. From 2014 through his arrest in December of 2021, Mr. Webler worked for Jamont Homes building residential homes and commercial buildings in Georgia.

John Jamont, President of Jamont Homes, wrote a letter of support when Mr. Webler asked the Magistrate Judge in Atlanta for a bond in this case. (*See* Exhibit 1). It is no less relevant now. Mr. Jamont describes how Matthew, without references in 2014 (after his accident), framed a 6,000 square foot home *by himself*. He was instantly hired. From there, Mr. Jamont explains, Matthew was given more roles and responsibilities, including troubleshooting and fixing mechanical problems with the company's heavy construction equipment. Mr. Jamont points out that "in almost all instances, he successfully identified the issues." (Id.). Mr. Jamont describes Matthew as "professional" and a "respectful and trustworthy individual to do business with." (Id.). Again, he worked with Mr. Webler for seven years.

12

In 2016, Mr. Webler went into business with his in-laws and opened CMK Utilities, a horizontal directional drilling ("HDD") company. His brother in law had experience in this area and Matthew was a quick study, soon taking over leadership of the business. As an owner and operator of CMK Utilities, Mr. Webler secured jobs to drill channels for utility lines, such as fiber optic cable runs. Through CMK Utilities, Mr. Webler worked for utility companies (e.g., Verizon, Google, AT&T), the Georgia Department of Transportation, and residential and commercial developers. In addition, Mr. Webler contracted with other HDD companies to assist with their drilling work. Eventually, Mr. Webler decided to close the company and work exclusively for other HDD firms. He had been working 12 – 18 hour days and running the business end of the company, which he taught himself. He needed more balance and felt that performing contract work for others was a way to achieve it.

From 2018 to his arrest in December of 2021, Mr. Webler worked as a drilling specialist and foreman for JR Industrial & Consulting, an underground construction and utility installation firm. Mr. Jamarr Rawlinson, the President of JR Industrial, provided a letter of support. (Exhibit 2). In his letter, Mr. Rawlinson explains that Matthew joined his team in 2018 and worked as a Field Coordinator and operator. (Id.). Mr. Rawlinson writes: "His contribution to the company has been tremendous because he has been and continues to be one of my most reliable

employees who is always willing to go above and beyond to get the job done. He shows up to work on time and leaves after everyone else." (Id.). His opinion is shared by others.

Justin Turner, owner of Turner Tire and HD General Contractors out of Cleveland, Georgia, employed Mr. Webler for three years prior to his arrest. HD General Contractors was another HDD firm that contracted with Mr. Webler. As an HDD specialist, Mr. Webler worked there drilling channels for fiber optics. In his letter of support, Mr. Turner describes Matthew as "an outstanding employee" who is "dedicated, responsible, respectful, and has a huge heart." (Exhibit 3). Mr. Turner's letter amplifies the observations of Messrs. Rawlinson and Jamont concerning Matthew's work ethic, describing 16-18 hour workdays where Matthew worked extended hours alongside the stakeholders in the company to meet deadlines. But, Mr. Turner also describes a caring person whom he witnessed buy food for a homeless man and provide a 100% tip to a waitress during COVID-19. (Id.). Mr. Turner describes Mr. Webler's dedication and love for his wife and soon-to-be-adopted son. Mr. Turner characterizes Mr. Webler as a "valued asset to my company."

Mr. Webler has the full support of a loving mother and father, who witnessed a very positive change in him over the past eight years. Matthew was born at Langley Air Force Base in Hampton Virginia. Jay Webler, his father, was

in the U.S. Air Force. Jay has been married to Matthew's mother, Betty Webler, for 48 years. Jay, now 69 years old, joined the Air Force right out of high school, in 1971. He was quickly assigned to one of the active duty Air Force command bands in Warner Robbins, Georgia, as a percussionist.[4] It was there, he met his wife Betty at the USO. Eight months later, they were married.

After four years at Warner Robbins, Jay transferred to Clark Air Force Base in the Philippines where he played in the Pacific Air Command band. Later, he was transferred to Langley Air Force Base in Virginia to play in the Tactical Air Command band. That is where Matthew was born. Matthew was the first of five children born to Jay and Betty.

After three years at Langley, Jay was honorably discharged from the Air Force. He moved to New Jersey with his growing family to attend Bible college. Finding that it was not for him, Jay switched to electronics school, still in New Jersey. After obtaining a certification in computer electronics, and with three children, Jay worked service and repair jobs wherever he could find them before landing a series of corporate jobs.

The family moved to Georgia from New Jersey when Matthew was eight years old. In Georgia, Jay obtained a job with Humphrey Instruments doing field

---

[4] At the time, the various Air Force commands had their own musical bands. The purpose of the bands was to boost morale, improve the welfare of the troops, as well as recruitment.

repair on sophisticated laser equipment used for eye surgeries. After seven years with Humphrey, Jay switched to work at a company called Bio-Rad, servicing and repairing biological research equipment. In that job, Jay worked servicing and repairing complex laser scanning microscopes. He travelled extensively and called on the CDC, NIH, and major research universities, like Harvard and Yale. The work took Jay away from the family quite a bit with constant national travel. Betty stayed at home and raised the children in Georgia.

Eventually, when Matthew was about 18 years old, Jay left Bio-Rad to teach music so that he could be at home more. Matthew was struggling and getting into trouble at the time. Jay has been teaching music in various capacities since then. Now, Jay works at a music school in Johns Creek, Georgia, teaching percussion. He is semi-retired. He and Betty live in Lilburn, Georgia and have since 1997. Jay and Betty fully support Matthew and have been there for him through all of his ups and downs. Jay offered to post his house as collateral for a bond in this case, but the Magistrate Judge required detention.

A custodial sentence of less than 30 days would be sufficient punishment for parading in the Capitol Building, particularly in light of the positive steps Mr. Webler has taken over the past decade. During that time, Mr. Webler dedicated himself to his work and his family. Universally, those he worked with praise his work ethic, professionalism, skill, dependability, big heart, and love for his family.

His decision to enter the Capitol Building, after being caught up in the excitement of the moment does not change that.

### C.   The Remaining Sentencing Factors Are Served by a Custodial Prison Sentence of *Less than* 1 Month.

The need to deter, punish, and promote respect for the law, § 3553(a)(2), are in no way undermined by a short, custodial prison sentence for what Mr. Webler did here. He drove to Washington D.C. the evening of January 5, arriving early in the morning of January 6. He watched the speeches and walked down Pennsylvania Avenue to the Capitol. There, he was caught up in the demonstrations and walked forward to get a picture near what he thought was scaffolding for the inauguration. At some point, he continued forward and followed the line of people into the Capitol. He was not violent. He did not damage property. To the contrary, he chided others for doing so. He then left after 20 minutes, having seen enough. He drove back to Georgia that day. Later, he posted that he was proud for calling others out for damaging property and not getting too caught up himself.

The sentence which Mr. Webler requests would not result in disparity. 18 U.S.C. § 3553(a)(6). Although difficult to keep track of the shifting fact patterns and various sentences handed down by judges in these cases, from the government

chart, it appears that the vast majority of cases charged under 40 U.S.C. § 5104(e)(2)(G) result in probation or home detention.

Moreover, for those cases where more than 1 month of custodial time is imposed, the fact patterns appear to be more aggravated than Mr. Webler's case. *See U.S. v. Michael Curzio*, 1:21-CR-00041-CJN (time served, 6 months incarceration; defendant willfully refused police order to leave and was arrested and placed in handcuffs); *U.S. v. Karl Dresch*, 1:21-CR-00071-ABJ (time served, 6 months incarceration; defendant posted pre-January 6 he was "prepared for chemical attacks"; exhorted others to take back the country beforehand; remained inside and urged others to keep their masks on because of tear gas; and engaged in taunting posts afterwards about "total victory" and that he would be back even stronger); *U.S. v. Robert Reeder*, 1:21-CR-00049-TFH (3 months incarceration; describes tear gas; leaves and reenters the Capitol Building; records an assault on Capitol Police, telling an officer, "you need to retreat!"; describes that he was "one of the last people out" and proclaims, "We had to do battle with the police inside"). Another case involved pre-event posts showing an intent to storm the Capitol and then declaring on video while entering the Capitol, "We're going to f----ing go in here. Life or death. It doesn't matter." *U.S. v. Jennifer Ryan*, 1:21-CR-00050-CRC (2 months incarceration). Still another involved a person on the "front line" (i.e., the

18

initial push) who, in a CBS interview on-site stated, "We're going to take this damn place. If you haven't heard it's called the insurrection act and we the people are ready." *U.S. v. Boyd Camper*, 1:21-CR-00325-CKK (2 months incarceration; defendant also had a Go-Pro camera and is overheard inside the Capitol, on video, telling people outside *with masks* to come forward due to pepper spray). While no two cases are alike, these facts patters are far different than here. A sentence of less than 30 days would not result in disparity.[5]

Finally, the consequences of Mr. Webler's petty offense extend far beyond his sentence in this case, whatever it turns out to be. These collateral consequences are certainly relevant to whether additional punishment or deterrence is necessary for Mr. Webler here in the form of a custodial sentence. The investigation of Mr. Webler which followed the January 6 events led to a broad search warrant served on Facebook. This, in turn, led to a search warrant for Mr. Webler's home to look for a suspected firearm. Following the execution of that warrant and Mr. Webler's arrest for being inside the Capitol, he was charged with firearms registration and status offenses in the Northern District of Georgia. He is not charged with *doing* anything unlawful with the firearm, just possessing it in his home. Mr. Webler's

---

[5] A number of parading cases have had sentences of incarceration of 20, 30, 35, and 45 days.

advisory Guideline range is estimated to be no less than four years in a best-case scenario.

Should the Court impose a sentence of imprisonment of 30 days or more, additional criminal history points will accrue to Mr. Webler. *See* U.S.S.G. § 4A1.2(c)(1) (counting offenses where *at least* 30 days of imprisonment is imposed); U.S.S.G. § 4A1.1(c) (instructing to add 1 point). Of course, more than 60 days would result in 2 additional criminal history points. U.S.S.G. § 4A1.1(b).[6] Moreover, any time imposed in *this* case will be credited here and therefore will not be counted toward any sentence he may receive in the Northern District of Georgia. *See* 18 U.S.C. § 3585(b). This is so despite the fact that he was detained in both cases and the reality that Mr. Webler would likely have been released on bond for the January 6 misdemeanor offense had it not been for the status offense charges. So, declaring a "time served" sentence here would sweep away five months of custody credit he would otherwise receive from BOP. This posture certainly distinguishes this case from others.

The Court should take the posture of this case and its collateral consequences into account when it fashions an appropriate sentence. Mr. Webler

---

[6] "Prior sentence" is defined to mean any sentence previously imposed upon adjudication of guilty for conduct *that is not part of the instant offense*. U.S.S.G. § 4A1.2(a)(1). Mr. Webler's charges in Georgia are not part of this offense, although they are certainly a direct consequence.

respectfully requests a sentence of <u>29 days</u> of incarceration with an expression in the Judgment that this 29 days has already been served in this matter.[7] Mr. Webler will still face the charges in the Northern District of Georgia each of which carries a term of supervised release of three years. Mr. Webler has withdrawn his pretrial motions in the Georgia matter with the expectation that a plea agreement will be reached. *U.S. v. Webler*, 1-21-CR-504-TWT (N.D. Ga.), (Doc. 27). Almost certainly, the outcome will be a sentence of imprisonment to a term of several years with 36 months of supervision to follow. No additional time in this case is warranted.

## IV.   **CONCLUSION**

WHEREFORE, for all of the above reasons, Mr. Webler respectfully requests that the Court impose a sentence of 29 days of incarceration which has already been served in this matter.

This 26th day of April, 2022.

*/s/ Thomas L. Hawker*
THOMAS L. HAWKER
Georgia Bar No. 338670
Attorney for Matthew Webler

FEDERAL DEFENDER PROGRAM, INC.
Suite 1500, Centennial Tower
101 Marietta Street, N.W.
Atlanta, GA 30303
(404) 688-7530/Fax (404) 688-0768
Thomas_Hawker@fd.org

---

[7] Of course, Mr. Webler will lose these 29 days of credit with the BOP.

21

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been formatted in Book Antiqua 13 pt., and was filed by ECF this day with the Clerk of Court with a copy served by ECF notice upon counsel of record as follows:

> Alison Prout, Esq.
> Assistant United States Attorney
> 600 Richard B. Russell Building
> 75 Ted Turner Drive, S.W.
> Atlanta, Georgia  30303

This 26th day of April 2022.

> */s/ Thomas L. Hawker*
> THOMAS L. HAWKER
> Georgia Bar No. 338670